**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FONTELLA BROWN-MARSHALL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 2534** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H. COAR** |
| **THOMAS DART, Sheriff of Cook County,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Fontella Brown-Marshall, an African-American female employed as a correctional officer by the Cook County Sheriff's Office, claims that the office discriminated against her based on her race and sex when it transferred her out of the internal affairs unit, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Defendant Thomas Dart, the Sheriff of Cook County, has now filed a motion for summary judgment. For the following reasons, Defendant's motion is GRANTED.

**I. FACTS[1]**

---

[1] The court has considered both the Plaintiff's and the Defendant's objections to the opposing side's statements. Where a statement is unsupported by the citations provided, the court has stricken the statement or, if appropriate, modified it to reflect accurately the evidence upon which it relies. Disputes of fact with evidence to support each side are noted; unsupported "disputes" are ignored. *See* N.D. Ill. L.R. 56(a), (b)(3). Because the court has considered each statement of fact and the opposing side's response, the court uses the abbreviation "DF" to refer to Defendant's statement of facts (R.20) and Plaintiff's response (R.27), and "PF" to refer to Plaintiff's statement of additional facts (R.27) and Defendant's response (R.30). Finally, the court on its own motion has omitted facts that are not relevant to the parties' dispute.

Fontella Brown-Marshall, an African-American woman, has been employed by the Office of the Sheriff of Cook County since April 1998. (DF ¶¶1,4.) Plaintiff began her employ as a correctional officer, but in 2006 she transferred to the internal affairs division, where her job title changed to "Investigator II" and she received a pay raise. (DF ¶¶4,5; PF ¶9.) In seeking the transfer in March of that year, Plaintiff had discussed the position with Timothy Kaufman, who was chief of internal affairs.[2] Kaufman requested her résumé and said that he would consider her application. (DF ¶6.) Plaintiff then interviewed with Kaufman for the position, and Kaufman told her that he would let her know his decision. (DF ¶7.)

The Internal Affairs Unit

Plaintiff does not know who was responsible for approving her transfer to the internal affairs unit, but Miriam Rentas, who became the deputy chief of internal affairs soon after Plaintiff's arrival, notified her of the decision. (DF ¶¶8,9,15.) (Before Rentas became deputy chief, Ronnie Gaines held that title. (DF ¶15.)) That same day, Plaintiff met with both Kaufman and Rentas. (DF ¶¶9, 10.) They explained to her their expectations and what the investigator job entailed. (DF ¶10.) Kevin Callanan, a seasoned investigator, initially was assigned as Plaintiff's field training officer for the purpose of teaching her the investigation format. (DF ¶11.) Plaintiff also attended classes related to the investigation process. (DF ¶12.)

There were approximately 17 investigators in the unit when Plaintiff arrived, including Rentas, Gaines, Callanan, Stan Augustyniak, Gregory Ernst, Robert Miller, Thomas Rosati, a man named Watson (whose first name Plaintiff cannot recall), Frank Poldosky, Georgia Garcia,

---

[2] The Plaintiff testified that in late 2007 she learned that Kaufman had been diagnosed with cancer, and that he is now deceased. (DF ¶23.)

Mike Desena, Angelique Westmoreland, and Paul Kimbrough. (DF ¶13.) All of the investigators held the job title of Investigator II, which carried the same official job description: investigating employee misconduct allegations, including allegations of abuse, stolen property, and other misconduct at the jail. (DF ¶¶14,16.)

Plaintiff's Caseload

When Plaintiff arrived, Rentas assigned her cases. (DF ¶17.) Plaintiff began with a very light caseload, until she was capable of handling more. (DF ¶18.) After her third or fourth month in the unit, Plaintiff was assigned more excessive-abuse cases, which involved lawsuits (these will be referred to as "lawsuit cases"). (DF ¶19.) Plaintiff was not the only investigator handling this type of case. (DF ¶19.) Plaintiff testified that, typically, she had twelve to fifteen cases on her caseload. (DF ¶36.)

The investigators did not all work on the same kinds of cases. (DF ¶14.) For example, Westmoreland, an African-American woman, investigated only jail cases involving inmates, such as battery cases, which Plaintiff considered less involved than lawsuit cases. (DF ¶20.) Plaintiff does not know why Westmoreland did not handle lawsuit cases. (DF ¶20.) Plaintiff also considered the caseload assigned to Garcia, an African-American woman, to be lighter than her own. (DF ¶¶30,34.) And Plaintiff thought that Watson, an African-American man, had a moderate caseload, carrying seven to nine cases, which Plaintiff considered average for the unit. (DF ¶¶31,35.)

Phones

The internal affairs unit had both analog and digital phones. When Plaintiff arrived, she was assigned an analog phone, which, unlike the digital phones, did not have caller ID.

According to the Plaintiff, Garcia, who is African-American, also had an analog phone. (PF ¶11.) Everyone else, however—including Kimbrough and Watson, who are African-American—had digital phones. Plaintiff testified, however, that the four white employees who joined the office after her were given digital phones, and only Eddie Wallace, an African-American employee who joined after Plaintiff, was given an analog phone. (DF ¶32; PF ¶11.) Plaintiff testified that the caller ID feature on the digital phones was useful for investigations. She says she requested a digital phone from a phone technician, who said that she had to submit a special request through the sheriff's office. (PF ¶11.) It's unknown whether Plaintiff submitted such a request.

<u>Kaufman's Behavior Toward African-Americans</u>

Kaufman never used racially derogatory language towards Plaintiff. (DF ¶33.) But Plaintiff believes he mistreated five other African-American employees: Amanda Gage, an administrative assistant in the internal affairs unit; Gwen Davis, the head of the discipline department; and Westmoreland, Garcia, and Wallace, who were all investigators. (PF ¶1.) Specifically, Plaintiff testified that Kaufman mistreated Gage by speaking harshly toward her when she refused to follow one of his orders. (PF ¶3.) Plaintiff also testified that she observed Kaufman engaging in a shouting argument with Westmoreland, at the end of which he told Westmoreland to leave the office. (PF ¶4.) And Plaintiff says she also heard Kaufman "curse out" Garcia during an argument. (PF ¶4.) Plaintiff testified that she was unaware of anything that transpired between Kaufman and Wallace, but she understood Kaufman to treat Wallace "harshly," including giving him what Plaintiff believes was a heavier-than-average caseload

involving more intricate work.  She also testified that Wallace was transferred out of the internal affairs unit.  (PF ¶5.)

Plaintiff testified that Kaufman also yelled at white investigators, but she never heard Kaufman "curse out" white employees like he did with Garcia.  Plaintiff perceived Kaufman's demeanor to be meaner when he dealt with African-American investigators than with white investigators.  (PF ¶2.)

<u>Plaintiff's Transfer in December 2007</u>

In December 2007, Kaufman disciplined Plaintiff because she was late to an interview she had scheduled with a correctional officer, whose conduct she was investigating.  The interview did not take place that day.  (DF ¶37.)  Plaintiff's appointment was for 7:30 a.m., and she did not arrive at work until 8:45 a.m.  (DF ¶38.)  The officer who was to be interviewed worked a shift that ended at 7 a.m.  (DF ¶39.)

Plaintiff initially received a 29-day suspension as discipline for missing the interview, but the suspension was withdrawn.  Instead, it was decided that Plaintiff would transfer out of the internal affairs unit to the program services department.  (DF ¶¶40, 41.)  Plaintiff remained in program services only for one day, however.  She was told by the director of program services that he had no place for an investigator in his department.  (DF ¶41.)  After that day, Plaintiff transferred to her current position as a correctional officer in the jail.  (DF ¶42.)

In the internal affairs unit, investigators may earn overtime pay if they are assigned the "duty car" position for a given week, which involves handling cases that come in after business hours.  (DF ¶25.)  It is not apparent in the record whether correctional officers have a comparable opportunity to earn overtime.  Plaintiff testified that the switch from being an

investigator to a corrections officer was "very uncomfortable" because she was now being supervised by individuals whom she had previously investigated and, in some instances, recommended for discipline. (PF ¶10.) Plaintiff also described the resulting situation as "unsafe," in that it made her doubt whether her coworkers would support her if she needed help. (PF ¶10.) Plaintiff has not indicated whether her pay decreased following her transfer.

Other Transfers

On the same day Plaintiff transferred out of internal affairs, Kaufman also ordered Callanan, a white investigator, to transfer. Plaintiff believes that decision was made because the two had a professional disagreement about how a case should be handled. (DF ¶43.) She understood Kaufman to be upset with Callanan, but she is not aware of Callanan being charged with misconduct or receiving any discipline. (DF ¶44.) Plaintiff believes Callanan took his caseload with him following his transfer and has since returned to the internal affairs unit. (PF ¶6.) .

Plaintiff also testified that, at an unspecified time, Mike Desena, a white investigator, was transferred out of the internal affairs unit to an administrative unit in the Maywood Courthouse. She understood the transfer to be based on a pending investigation into his misconduct, although the nature of the misconduct is not apparent in the record. (DF ¶45; PF ¶7.)

Finally, Plaintiff testified that investigators Westmoreland and Tenile Miller, who are both African-American women, also were removed from the internal affairs unit and now work in the jail. (PF ¶8.) Again, the reasons for their removal and their placement in the jail are not apparent in the record.

<u>Other Employees Who Missed Interviews</u>

Plaintiff recalls a time when an officer arrived to speak to a white investigator—possibly Greg Ernst—at an agreed time, but he was out of the office. (DF ¶46.) Plaintiff says she did not alert Kaufman that Ernst had missed an interview, however, and she does not know whether Kaufman knew about it. (DF ¶46.) Plaintiff also believes that another white investigator named Kerlin, whose first name is not in the record, also once did not show up for a meeting with someone in the office. Plaintiff testified that she did not alert Kaufman of Kerlin's absence, nor does she know whether Kaufman was aware of it. (DF ¶47.) Other than these two employees, Plaintiff is unaware of any other investigators who missed interviews with witnesses. (DF ¶48.)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in her pleadings or conclusory statements in affidavits; she must support her contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material

facts.  *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation

and quotation omitted).  And "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at

323.

### III. ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating

against an employee "with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e-2(a)(1).  To prove race discrimination, Plaintiff may use the direct or indirect

methods outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or she can

combine both approaches.  *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007).  No

matter which path she chooses, the basic question is whether her employer was motivated by an

discriminatory purpose.  *Id.* at 671.

Forgoing any argument under the direct method, Plaintiff opts only to use the indirect

method, which demands that she establish a prima facie case of discrimination with evidence that

(1) she is a member of a protected class (2) who suffered a materially adverse employment

action (3) despite the fact that she was meeting Defendant's legitimate expectations, and that

(4) Defendant treated similarly situated employees who were not members of her protected class

more favorably.  *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009).  If she makes such

a showing, Defendant must offer a legitimate, nondiscriminatory reason for its action, which

Plaintiff may rebut by showing that the reason is a pretext for discrimination.  *See Peirick v. Ind.*

*Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007).

Plaintiff contends that she was transferred out of the internal affairs unit and assigned to work as a correctional officer in the jail because of her race and sex. In addressing her claim, both parties focus on two elements: whether similarly situated employees outside of her protected class were treated more favorably, and whether Defendant's proffered reason for transferring her is pretextual.

The court begins, then, with the "similarly situated" requirement, which is flexible. Plaintiff need only identify an employee with "sufficient commonalities on the key variables . . . to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 128 S. Ct. 1951 (2008). This would normally entail a showing that Plaintiff and the comparator shared the same supervisor and performance standards and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick*, 510 F.3d at 688. An employee need not show complete identity in comparing herself to a better treated employee, but she must show substantial similarity. *Humphries*, 474 F.3d at 405.

In support of this prong, Plaintiff relies only on her testimony that (1) Callanan, a white man, was transferred to court services following a disagreement with Kaufman about the handling of a case, took his caseload with him, and subsequently returned; (2) Desena, a white man, was transferred to an administrative unit in the Maywood courthouse following an allegation of misconduct; and (3) Miller and Westmoreland, both African-American women, were transferred out of the internal affairs unit and into the jail. Defendant responds that

Plaintiff has not made the requisite showing that any of the employees she identified shared enough common features to allow a meaningful comparison.

The court agrees with the Defendant that, without evidence that other employees engaged in similar conduct, Plaintiff has failed to satisfy this prong. Plaintiff has put forth evidence that she and the employees she named worked in the same unit, held the same position, and were transferred out of the unit—but the comparison ends there. First, Plaintiff's testimony about Callanan's transfer shows that the circumstances were not, in fact, similar: unlike Plaintiff, Callanan was not charged with misconduct. Rather, his transfer followed a disagreement between him and Kaufman about the handling of a case. Second, while Plaintiff testified that Desena had been charged with misconduct, she has made no attempt to clarify the nature of the alleged misconduct, the identity of the decisionmaker who transferred him, nor whether Desena received any other discipline. Although the court need not know *all* of the details surrounding his transfer, the record's silence on each of these matters invites only speculation and hunches, which are not enough to survive a motion for summary judgment. *See Winsley*, 563 F.3d at 605; *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co.*, 544 F.3d 752, 757 (7th Cir. 2008). Finally, in attempting to draw parallels to Defendant's treatment of Miller and Westmoreland, Plaintiff does not offer any detail about the circumstances of their transfers. Instead, she relies only on her own, conclusory testimony that Kaufman transferred each of them because they are African-American women. "Although testimony alone can defeat summary judgment motions in some cases, asserting a conclusion is no substitute for detail where detail is needed to support a claim." *United States v. Global Distribs., Inc.*, 498 F.3d 613, 619 (7th Cir. 2007).

In short, Plaintiff has made no attempt to compare Defendant's treatment of her to other employees who engaged in similar conduct and were outside of her protected class.[3] Given her failure to develop the evidentiary record on this score, she has not met her burden of proof. *See Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1111 (7th Cir. 2004) (explaining that summary judgment was proper where employee failed to supply details, other than race, that would allow meaningful comparison between herself and other employees); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (explaining that, where African-American employee did not attempt to depose white workers or their supervisors, his testimony that white workers were not transferred to less desirable jobs was insufficient without personal knowledge of the workers' performance).

For the sake of completeness, the court also considers Plaintiff's arguments that the reason for her transfer was pretextual. To establish pretext, she must show that Defendant's nondiscriminatory reason was dishonest, and that the true reason was discriminatory animus. *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007). Thus, to stave off summary judgment, Plaintiff had to provide evidence tending to show that Defendant's reason for transferring her was (a) factually baseless, (b) not the actual motivation for the action, or (c) insufficient to motivate the action. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001). She also had to provide evidence from which a jury could infer that the real reason was discriminatory. *Perez*, 488 F.3d at 778.

---

[3] Although there is some evidence that two white, male investigators missed or were late for interviews, Plaintiff does not point to this evidence in her brief. In any event, there is no evidence that Kaufman knew about those employees' conduct.

Here, the factual basis for the proffered reason—that she arrived over an hour late for a scheduled interview with an officer she was investigating—is undisputed, and Plaintiff does not contend that her misconduct was insufficient to motivate the Defendant's action. Plaintiff's sole contention is that her tardiness for the interview was not the actual motivation for her transfer. In support, she first rehashes her contention that Defendant treated similarly situated white investigators differently—a proposition that she has not supported with sufficient evidence, as explained *supra*. She also argues that the Defendant's decision to rescind her 29-day suspension suggests that the reason it gave was "phony"; but she does not explain, nor is it clear, how selecting a different punishment casts doubt on the honesty of Defendant's rationale.

Meanwhile, Plaintiff supports her alternative explanation—discriminatory animus—only with her testimony that she perceived Kaufman to have mistreated African-American employees. But Plaintiff's broad-stroked, conclusory assessment of Kaufman's behavior, absent details that would allow a jury to infer that he was motivated by race and sex, is insufficient. *See Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir. 2006). And though Plaintiff's testimony about phone assignments is some evidence of disparate treatment—white investigators were assigned digital phones with Caller ID, whereas some African-American investigators, including her, were assigned analog phones—it has limited probative value in showing pretext. Plaintiff has not shown that this was a significant enough deprivation that a jury could infer animus, nor that Kaufman, the only decisionmaker she has identified, was responsible for assigning phones. *See Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 626-27 (explaining, in retaliation context, that "animus harbored by a non-decisionmaker is usually ineffective to show pretext where . . . there is a non-retaliatory reason for the employer's decision.").

## IV. CONCLUSION

Because Plaintiff has not presented sufficient evidence upon which a jury could conclude that Defendant discriminated against her because of her race or sex, the court GRANTS Defendant's motion for summary judgment.

**Enter:**

/s/ David H. Coar

_____

David H. Coar

United States District Judge

Dated: **July 1, 2009**